IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


KANSAS PENN GAMING, LLC,

              Plaintiff,

    vs.                        **Case No. 08-4111-RDR**

HV PROPERTIES OF KANSAS, LLC,

              Defendant.

────────────────────────────

HV PROPERTIES OF KANSAS, LLC,

              Plaintiff,

    vs.                        **Case No. 08-4115-RDR**

PENN NATIONAL GAMING, INC.,

              Defendant.

────────────────────────────


## MEMORANDUM AND ORDER

These consolidated actions arise from the decision of Kansas Penn Gaming, LLC (KPG)[1] to terminate a property purchase agreement with HV Properties of Kansas, LLC (HV) for the acquisition of certain parcels of land in southeast Kansas for the development of a casino. Each side has filed a motion for summary judgment. HV

───────────────

[1] Penn National Gaming, Inc. (Penn National) is named as the defendant in Case. No. 08-4115-RDR. Penn National is engaged in the business of developing and operating gaming facilities. Penn National is the sole member of KPG. Penn National formed KPG for the purpose of applying for, and developing and managing, a gaming facility in Cherokee County, Kansas. Penn National guaranteed the performance and payment of KPG's obligations under the sale contract that is the subject of this litigation. For the purposes of the instant motions, the court will only refer to KPG unless required by the facts.

has also filed a motion to strike expert testimony. The court has heard oral argument on these motions is now prepared to rule.

**MOTIONS FOR SUMMARY JUDGMENT**

I.

These cases arose after the passage of legislation by the Kansas legislature that authorized the development of casinos in various areas of the State of Kansas. Following the passage of this legislation, KPG and HV entered into a real estate sale contract. KPG purchased the land from HV in Cherokee County, Kansas to develop a casino there. KPG took the necessary steps with the State to begin the process of being the operator of a casino in Cherokee County. The real estate contract required KPG to pay $2.5 million to acquire HV's interest in the land. The land contract also provided for two contingent payments totaling $37.5 million by KPG upon the occurrence of two separate events.

Subsequently, KPG notified the State that it was withdrawing its application for the operation of a casino in Cherokee County. Also, on that date, KPG notified HV that it would not develop a casino on the land noted in the real estate sale contract. This action led to the filing of these lawsuits. In its complaint, KPG seeks a declaratory judgment that it has no further obligations under the sale contract because it properly terminated the sale contract with HV prior to the occurrence of the events that required the contingent payments of $37.5 million. In its

complaint, HV seeks damages of $37.5 million plus interest, costs and attorneys fees because it alleges that KPG breached the sale contract by failing to pay the contingent payments.

In its motion for summary judgment, KPG contends that, in terminating the property purchase agreement, it complied with all of its contractual obligations.  Specifically, KPG argues that it used good faith commercially reasonable efforts to obtain a management contract with the State of Kansas, and that it validly terminated the sales contract after failing to receive a management contract that was reasonably acceptable to it.  In its motion for summary judgment, HV argues that KPG breached the property purchase agreement when it withdrew its application to develop a casino in Cherokee County.  HV asserts that KPG had received a reasonably acceptable management contract and would have received, but for its termination, a final management contract.  HV contends that it is entitled to payment of $37.5 million, the remaining balance under the contract.

II.

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). In applying this standard, the court views the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party.  Adler v. Wal-

3

Mart Stores, Inc., 144 F.3d 664, 670 (10th cir. 1998). This legal standard does not change where, as here, the court is ruling on cross-motions for summary judgment, for each party still has the burden to establish the lack of a genuine issue of material fact and its entitlement to judgment as a matter of law. City of Shawnee, Kan. v. Argonaut Ins. Co., 546 F.Supp.2d 1163, 1172 (D.Kan. 2008). In ruling on the parties' motions, the court must keep in mind that "[c]ross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." Id.(quoting Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979))(internal quotations omitted). To the extent the cross-motions overlap, however, the court may address the legal arguments together.

III.

The court finds that the following facts are undisputed in the record. In April 2007, the Kansas legislature enacted the Kansas Expanded Lottery Act, K.S.A. 74-8733 et seq. (KELA). KELA authorizes the establishment of, inter alia, one "Lottery Gaming Facility" in each of the four specified "gaming zones" in Kansas, including one facility in the Southeast Gaming Zone, which encompasses Cherokee and Crawford counties in the southeast corner of the State. KELA contemplates that the Lottery Gaming Facilities it authorizes will be owned by the State, but managed by "Lottery Gaming Facility Managers" whose management terms and conditions

4

will be governed by a "management contract." KELA prescribes a multi-step process for management contracts. Under the process, the approval of the Lottery Commission, the Lottery Gaming Facility Review Board (Review Board) and the Kansas Racing and Gaming Commission (KRGC) is necessary. KELA further requires the voters in the local government entity where a casino would be located to endorse gambling within its boundaries through a referendum election.

HV is a Kansas limited liability company formed on or about February 2, 2005. The initial members of HV were Gary Hall and Steve Vogel, both of whom are natives of Galena, Kansas, which is located in Cherokee County, Kansas. Effective January 1, 2006, Tim Shallenburger and Ross Vogel were admitted as members of HV. Members of HV began working for the passage of gaming legislation in Kansas in 2003 and continued to do so until the 2007 legislative session. KPG also worked for the passage of gaming legislation in 2006 and 2007 by hiring lobbyists and providing funds to generate support for the legislation. Members of HV began looking for a site suitable for a gaming facility as early as 2003 in the event the Kansas legislature adopted enabling legislation. They eventually procured several parcels of land in Cherokee County.

The referendum election on gambling was held in Cherokee County on June 5, 2007 and passed. On July 23, 2007, the County Commissioners of Cherokee County passed a resolution which gave KPG

an exclusive endorsement to be operator of a Lottery Gaming Facility in Cherokee County.

On September 6, 2007, HV and KPG entered into a real estate sale contract. The contract required KPG to pay $2.5 million to acquire HV's interest in certain parcels of land in Cherokee County. The land contract also provided for two contingent payments by KPG: (1) $17.5 million ten days after the Lottery Gaming Facility Management Contract Award Date [Section 3.3]; and (2) $20 million on the earlier of (a) ten days after the date KPG commences gaming operations on the property or (b) 30 months after the Lottery Gaming Facility Management Contract Award Date unless delayed due to any Force Majeure Event [Section 3.4]. The land contract defines the "Lottery Gaming Facility Management Contract Award Date" as "the date upon which [KPG] has obtained all final, unappealed and unappealable licensing under [KELA] and [KPG] has received a fully executed Lottery Gaming Facility Management Contract . . . and all appeal periods with respect to the grant and execution of such Lottery Gaming Facility Management Contract have lapsed without an appeal therefrom having been taken or any appeal thereof having been resolved in favor of [KPG]."

Section 13.1 of the land contract provides that KPG shall use "good faith commercially reasonable efforts to be designated the Lottery Gaming Facility Manager and enter into a Lottery Gaming Facility Management Contract with respect to the Southeast Gaming

Zone." It further provides that if KPG is not designated the manager of the gaming operations in the Southeast Kansas gaming zone and does not receive a Lottery Gaming Facility Management Contract "reasonably acceptable" to it, KPG has no obligation to make the contingent payments and KPG shall own the property subject to HV's "Purchase Option."

Section 16.5 of the land contract provides as follows:

Gaming Law Invalid. Notwithstanding any other term or condition of this Contract to the contrary, in the event that at any time prior the date [KPG] completes the payment pursuant to Section 3.4...[KPG] is unable to conduct Gaming Operations within the Subject Property (i) because it is unable after exercise of good faith and commercially reasonable efforts to obtain and maintain all necessary governmental management agreements, licenses, legal entitlements and/or permits, (ii) because any necessary governmental management agreement, license, legal entitlements or permit expires and/or is not renewed or is revoked, provided that [KPG] has made good faith and commercially reasonable efforts to replace, renew and/or reinstate such agreement, legal entitlements and/or permit, (iii) because all or any material portion of the Subject Property cannot, pursuant to the application of applicable law, be used for Gaming Operations after (KPG) has exercised good faith and commercially reasonable efforts to contest the application and/or validity of such law and such event makes Gaming Operations at the remainder of the Subject Property impracticable or frustrates the intent of the Contract, (iv) because the applicable enabling legislation permitting Gaming Operations is amended, suspended or revoked by the applicable legislative body, or (v) because any such enabling legislation is held invalid by a court of competent jurisdiction, provided that [KPG] has made commercially reasonable efforts to challenge such ruling, then [KPG] may elect, in its sole and absolute discretion and at any time after the occurrence of such event, to terminate the Contract, effective immediately, by giving written notice of such termination to [HV].

Section 19 of the land contract contains an integration clause which provides, in part, that "[t]his Contract . . . supersedes any letter of intent or prior agreement between [KPG] and [HV] and constitutes the entire agreement between [KPG] and [HV] relating to the subject matter hereof and there are not other terms, conditions, promises, understanding, statements or representations, express or implied, concerning the sale contemplated hereunder."

The "purchase option" referenced in section 13.1 is contained in a "Repurchase Agreement" also signed on the same date as the land contract and attached to it as an exhibit. It provides HV "an option to purchase the Subject Property" for the "price [KPG] paid to [HV] . . . for such Subject Property pursuant to" the land contract, exercisable by HV "for a period of ninety days following receipt by [HV] of a Notice of Termination . . . from [KPG]." Section 2 of the Repurchase Agreement provides as follows:

> Notice of Termination. If, after [KPG] has applied for the necessary management contracts/agreement, licenses and/or other regulatory approvals necessary for [KPG] to operate a destination lottery gaming facility under Kansas law, and [KPG], prior to being awarded a Lottery Gaming Facility Management Contract by the Kansas Gaming Authority, determines not to proceed with developing a destination lottery gaming facility on the Subject Property, [KPG] shall give [HV] written notice of such intent not to proceed (the "Notice of Termination").

Section 6.8 of the Repurchase Agreement contains an integration clause which provides, in part, that "[t]his Agreement . . . contains the entire agreement and understanding of the parties with respect to the entire subject matter hereof, and there

8

are no representations, inducements, promises or agreements, oral or otherwise, not embodied herein. Any and all prior discussions, negotiations, commitments and understandings relating thereto are merged herein."

On September 28, 2007, KPG paid $2.5 million to acquire the property. On the same date, the parties closed the real estate transaction and title to the portion of the property owned by HV, as well as HV's rights in the remaining portion of the property, passed to KPG. Later, KPG acquired fee title to all of the property through the exercise of options assigned to it by HV. Also on September 28, 2007, HV recorded the Repurchase Agreement against the property, as required by section 28 of the land contract.

On August 31, 2007, KPG submitted its application for a management contract in the Southeast Gaming Zone. KPG's application was the only application submitted in the Southeast Gaming Zone before the expiration of the original September 6, 2007 application deadline. Keith Kocher, the Director of Gaming Facilities for the Kansas Lottery, testified that KPG provided additional information in support of its application "every time" the Kansas Lottery requested such information. Kocher also testified that KPG's application complied with all published procedures issued by the Kansas Lottery concerning the application process.

In May 2007, the Quapaw Indian tribe of Oklahoma announced plans to develop a large-scale casino in Oklahoma, to be located directly across the border from the site of the proposed Cherokee County casino. At the time when the Quapaw tribe announced its plans to develop a casino, and for several month afterwards, KPG was uncertain about the Quapaw's ability to develop its proposed casino, including the ability to obtain financing to build a large casino. Members of HV were also skeptical about the ability of the Quapaw to build a large, successful casino. Despite the uncertainty, KPG viewed the Quapaw's proposed casino as a potential threat to the economic viability of a gaming facility in Cherokee County. To attempt to address that threat, KPG engaged in efforts to expedite the State's review of KPG's application so that the Cherokee County casino could open as early as practicable.

In August 2007, KPG began exploring whether to apply for a management contract for a proposed gaming facility in Sumner County, Kansas, located within Kansas' South Central Gaming Zone. In November 2007, Penn Sumner, LLC, another subsidiary of Penn National, applied for a management contract in the South Central Gaming Zone. Three other gaming companies also applied for a management contract in that zone.

On August 15, 2007, the Lottery Commission extended the application deadline in the Southeast Gaming Zone for 90 days. The extended application deadline expired on December 6, 2007 with no

additional applications having been received.  KELA provides that following the expiration of an application deadline in a given zone, the Kansas Lottery has 90 days to negotiate and execute a management contract with the applicant(s) in the zone.  On March 4, 2008, the Lottery Commission requested, and on March 5 the Governor of Kansas granted, a 60-day extension to May 5, 2008 on the deadline to enter into a management contract with KPG in the Southeast Gaming Zone.

In addition to opposing extensions on the application deadline, KPG engaged in efforts to stop the development of the Quapaw casino, including investigating whether the Quapaw's proposed casino development was in violation of applicable environmental regulations.  KPG also participated in and financed a legal challenge, which culminated in a federal lawsuit against the United States Department of Interior, based on whether the federal government had improperly acquired and conveyed portions of the Quapaw's Oklahoma land such that, pursuant to federal Indian gaming regulations, the land could not legally be used for gaming purposes.

By March 2008, KPG began to negotiate in earnest with the Kansas Lottery on a proposed management contract.  KELA sets forth certain requirements for management in the Southeast Gaming Zone including (1) the proposed development consists of an investment in infrastructure of at least $225,000,000; and (2) deposit of a

refundable $25 million "privilege fee." KELA also required payment
of the following amounts of net revenues: (1) 22 percent to the
State of Kansas, (2) 2 percent to a fund for gambling addiction,
and (3) 3 percent to local governments. The maximum initial term
of a management contract is 15 years from the date of opening.
Stephen Martino, the Executive Director of the KRGC, testified that
if, after the term of a management contract expires, the existing
manager is unable to negotiate a new management contract with the
Kansas Lottery, the application process "would open anew."

At the time of negotiating the management contract, KPG's
efforts to stop the development of the Quapaw casino had been
unsuccessful, and KPG was concerned that a $225 million casino
would not be viable in Cherokee County with the competition from
the Quapaw. To attempt to mitigate that concern, KPG requested
that the Kansas Lottery permit it to phase the minimum required
$225 million investment in infrastructure over time during the term
of the management contract, specifically by making an initial $125
million investment, and then spending the remaining $100 million at
specified intervals. HV members had no problem with this proposal.

On May 5, 2008, KPG and the Kansas Lottery signed a management
contract. By its terms, and consistent with the KELA, the
management contract did not become "effective and binding" upon its
execution, but rather not "until it is approved, as required by
[KELA], by all three of . . . (a) the [Lottery] Commission; (b) the

Lottery Gaming Facility Review Board; and (c) the Kansas Racing and
Gaming Commission." After executing the management contract, KPG
continued to submit information in support of its application and
to develop plans for the construction of casinos in both Cherokee
and Sumner counties. KPG also promoted its application at
proceedings before the Review Board. On June 4, 2008, KPG
deposited a refundable $25 million privilege fee with the Kansas
Treasurer. Pursuant to the KELA, KPG was permitted to withdraw its
application and receive a refund of the $25 million privilege fee
at any time before the management contract became final and
binding, i.e., before the approval of all the agencies involved.

On July 5, 2008, the Quapaw tribe opened the $300 million
Downstream Casino for business. The Quapaw casino operated under
a lower tax rate than the 27 percent rate that would have applied
to the Cherokee County casino. After the Quapaw casino opened,
KPG determined that the proposed Cherokee County casino was not a
reasonable investment for it to undertake under the terms available
to it in the management contract. Before making that determination,
KPG analyzed the Cherokee County investment in various ways. The
results of KPG's analysis led KPG to conclude that, even with a
phased capital investment, the Cherokee County investment would not
generate a sufficient return on investment to meet KPG's internal
investment thresholds.

Steve Wilson, an attorney who had been a managing partner at

Tennenbaum Capital Partners, LLC, an investment management company, reviewed the evidence as an expert witness for KPG and concluded that KPG conducted its financial modeling in good faith, and that if the modeling was biased in any manner, it was biased in favor of the project rather than against it.

Although KPG did not believe that the proposed Cherokee County casino was a viable investment on a standalone basis after the Quapaw casino opened, it did believe that the proposed Cherokee County casino investment combined with the proposed Sumner County casino investment presented a viable overall investment for the company. In reaching this conclusion, KPG was hopeful that operating two similarly-themed casinos in southern Kansas would generate sufficient return on investment to justify the company's combined investments in Kansas. KPG made efforts to promote their "Southern Strategy" with the Review Board. HV and its representatives thought this was a sound move.

On August 21 and 22, 2008, the Review Board conducted hearings in anticipation of its vote on KPG's management contract in the Southeast Gaming Zone and Penn Sumner's management contract in the South Central Gaming Zone. On August 22, 2008, the Review Board voted 5 to 2 to approve KPG's management contract in Cherokee County as the "best possible contract" in the Southeast Gaming Zone. The Review Board, however, also voted on August 22nd to approve a management contract of an applicant other than Penn

14

Sumner as the possible contract in the South Central Gaming Zone. That vote ended Penn Sumner's application in the South Central Gaming Zone, and also ended KPG's efforts to pursue the Southern Strategy. KPG continued to study the viability of the Cherokee County casino but ultimately determined that there was nothing more it could do within the time frame it had to withdraw that could render the project a reasonable investment for it under the terms of the management contract.

On September 11, 2008, KPG notified the Kansas Lottery that it was withdrawing its application in the Southeast Gaming Zone. Because, as of that date, the KRGC had not approved the management contract, KPG was permitted to withdraw its application and obtain a refund of the $25 million privilege fee that it had deposited. Since KELA was enacted, at least five applicants for management contracts in Kansas' various gaming zones, including KPG, have withdrawn their applications to be awarded final management contracts after executing management contracts with the Kansas Lottery, and three of those applicants, including KPG, withdrew after the Review Board had approved their respective management contracts, but before their contracts had been approved by the KRGC.

Stephen Martino testified that KPG was "responsive" to the KRGC's requests for information, and that up until the time when he became aware that KPG had withdrawn its application, KPG "provided

[the KRGC with] everything that [the KRGC] ever asked for."
Although the KRGC sent KPG a letter on September 8, 2008 requesting
that KPG submit by September 23, 2008 certain information in
furtherance of KRGC's background check, KPG withdrew it's
application before that information would have been due. KPG
informed the KRGC on September 12, 2008 that it would not be
providing information responsive to the KRGC's September 8, 2008
response. Martino understood the reason that KPG did not provide
this information because KPG "was on the cusp of withdrawing at
that time."

On September 11, 2008, KPG sent a "Notice of Termination" to
HV pursuant to section 2 of the Repurchase Agreement in which KPG
notified HV of its "determin[ation] not to proceed" with developing
a destination lottery gaming facility on the property. HV chose
not to exercise its repurchase option under the Repurchase
Agreement. Since September 1, 2008, HV has not "had any
communications with anyone . . . regarding the proposed development
of the Subject Property or any alternatives for development of the
Subject Property."

IV.

In its motion, KPG contends that it complied with all its
contractual obligations. It suggests that it (1) used good faith
commercially reasonable efforts to obtain a management contract;
(2) did not obtain a final management contract that was reasonably

16

acceptable to it; and (3) after determining not to proceed with the casino, provided HV with notice under Section 2 of the Repurchase Agreement, thus allowing HV the option to repurchase the property.

In its motion, HV suggests a variety of interpretations of the contract to support its position. HV argues: (1) KPG has no discretion to decide whether the proposed management contract was "reasonably acceptable" to it and never had a right to "determine not to proceed" with developing the casino; (2) the only circumstance that KPG could "determine not to proceed" was if it simply could not proceed because either its application was denied or KELA was invalidated; (3) the Repurchase Agreement is unnecessary and thus not controlling. HV contends that KPR is not entitled to summary judgment because the following genuine issues of material fact remain to be decided: (1) whether the management contract was reasonably acceptable to KPG; (2) whether the casino project was viable; and (3) whether KPG proceeded in good faith.

A.

"The fundamental rule in construing the effect of written instruments is that the intent and purpose of the parties be determined from an examination of the entire instrument or from its four corners. Thus, the language used anywhere in the instrument should be taken into consideration and construed in harmony with other provisions." Heyen v. Hartnett, 235 Kan. 117, 679 P.2d 1152, 1156 (1984). "Whether ambiguity exists in an instrument is a

17

matter of law to be decided by the court." <u>Mobile Acres, Inc. v. Kurata</u>, 211 Kan. 833, 508 P.2d 889, 895 (1973). "The interpretation of a written contract which is free from ambiguity is a judicial function." <u>Hall v. Mullen</u>, 234 Kan. 1031, 678 P.2d 169, 174 (1984).

A contract is ambiguous only when the words used to express the meaning and intent of the parties are "insufficient in that the contract may be understood to reach two or more possible meanings." <u>Amoco Prod. Co. v. Charles B. Wilson, Jr., Inc.</u>, 266 Kan. 1084, 976 P.2d 941, 945 (1999)(citation omitted); <u>see also Liggatt v. Employers Mut. Cas. Co.</u>, 273 Kan. 915, 46 P.3d 1120, 1125 (2002). "[C]ourts should not strain to create an ambiguity where, in common sense, there is none." <u>First Fin. Ins. Co. v. Bugg</u>, 265 Kan. 690, 962 P.2d 515, 519 (1998)(citation omitted). That the parties differ as to what an unambiguous contract requires does not mandate that this court declare the contract ambiguous. <u>Ryco Packaging Corp. v. Chapelle Int'l Ltd.</u>, 23 Kan.App.2d 30, 926 P.2d 669, 674 (1996).

"[M]eaning should be ascertained by examining the documents from all four corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision...." <u>Akandas, Inc. v. Klippel</u>, 250 Kan. 458, 827 P.2d 37, 44 (1992)(citation omitted); <u>see also Gray v. Manhattan Med. Ctr., Inc.</u>, 28 Kan.App.2d 572, 18 P.3d 291, 298

(2001).  An unambiguous contract must be enforced according to its plain, general, and common meaning in order to ensure that the parties' intentions are enforced.  <u>O'Bryan v. Columbia Ins. Group</u>, 274 Kan. 572, 56 P.3d 789, 792 (2002); <u>Boos v. Nat'l Fed'n of State High Sch. Assn's</u>, 20 Kan.App.2d 517, 889 P.2d 797, 803 (1995).

B.

In an earlier order, the court examined the instant contract in considering KPG's motion to dismiss.  There, the court stated the following:

> The court agrees with KPG that the repurchase agreement must be considered as part of the real estate contract.  The repurchase agreement is expressly incorporated into the contract and attached as "Exhibit E" to the contract.  Thus, the repurchase agreement is an express part of the contract.  <u>Hammond v. Lowe's Home Centers, Inc.</u>, 316 F.Supp.2d 975, 978 (D.Kan. 2004) (under Kansas law, documents executed at the same time as part of a single transaction are construed together to determine the intent, rights and interests of the parties).  However, we are not persuaded at this point that the language of section 2 of the repurchase agreement gives KPG complete discretion to terminate the contract at any time for any reason.  Rather, this section must be read in harmony with section 13.1 of the sales contract which requires KPG to "use good faith commercially reasonable efforts" to obtain the final management contract from the State of Kansas for the operation of the casino.  Moreover, section 13.1 stated that KPG could terminate the contract if the final management contract offered by the State of Kansas was not "reasonably acceptable" to it.  The issue of whether KPG acted in accordance with the requirements of the contract in terminating it is a fact issue that cannot be resolved on a motion to dismiss.  Accordingly, KPG's motion to dismiss must be denied.

The court continues to believe that we properly interpreted the instant contract when we considered the motion to dismiss.

Nevertheless, the court shall continue to examine portions of the contract in light of the arguments made by the parties in their motions for summary judgment. The court shall examine the issues that have been raised by the parties since that order. The parties have indicated that they believe the sale contract is unambiguous, despite the fact they have differing interpretations of it. The court believes that the following issues are presented: (1) Did KPG use "good faith commercially reasonable efforts" to obtain the final management contract from the State of Kansas? and (2) Did KPG terminate the contract with HV because the final management contract offered by the State of Kansas was not "reasonably acceptable" to it?

C.

The court begins with the requirement that KPG was required to use good faith commercially reasonable efforts to obtain the final management contract. "Good faith commercially reasonable efforts" is not defined in the sale contract. Nevertheless, the court is convinced that the term is not ambiguous. The duty of good faith has been defined in Kansas as honesty in fact. Gillenwater v. Mid-Am Bank & Trust Co., 19 Kan.App.2d 420, 870 P.2d 700, 704 (1994). Pursuant to the duty of good faith, parties shall not "intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the

other party to receive the fruits of the contract." _Daniels v. Army Nat'l Bank_, 249 Kan. 654, 822 P.2d 39, 43 (1991). Commercially reasonable efforts are not defined in Kansas law, but courts have generally concluded that this term sets forth an objective standard requiring that a business use the efforts that a reasonable business entity would have made under similar circumstances. _See_, _e.g._, _Castle Properties v. Lowe's Home Centers, Inc._, 2000 WL 309395 at *3 (OhioApp. 2000) (unambiguous term that means to make every effort to obtain requirement that a reasonable business entity would have made under similar circumstances); see also _Westgate State Bank v. Clark_, 231 Kan. 81, 642 P.2d 961, 969-972 (1982) (under Uniform Commercial Code, "commercially reasonable manner" means that court should consider all relevant factors together as part of single transaction with ultimate test to be whether parties acted toward each other in good faith and in a reasonable manner).

This particular issue is easily decided. HV has produced virtually no evidence and no argument to suggest that KPG's efforts to obtain the final management contract were anything other than in good faith or commercially reasonable. The undisputed evidence before the court shows that KPG: (1) submitted complete and timely applications to the Kansas gaming officials and sought on several occasions to expedite the process; (2) developed comprehensive plans for a casino in Cherokee County and obtained approvals and

licenses; (3) used lobbyists and consultants to promote their application; (4) spent considerable time, effort and money to raise legal challenges to the Quapaw casino; (5) negotiated and signed a non-binding management contract; (6) deposited a refundable $35 million "privilege fee;" and (7) developed plans to phase investment and link Cherokee and Sumner casinos. Kansas gaming officials confirmed that KPG acted in good faith during the entire process.

HV's only contention concerning this issue is that KPG engaged in the Southern Strategy, i.e., the linking of the casinos in Sumner and Cherokee Counties, as a subterfuge to avoid developing the casino in Cherokee County and only to further the development of a "more lucrative" casino in Sumner County. The court finds no evidence to support such a contention. The record before the court shows that KPG adopted this strategy when it believed that a standalone casino in Cherokee County was not economically viable. Once that decision was made, KPG engaged in considerable efforts to pursue the Southern Strategy. Members of HV were aware of KPG's efforts and readily supported KPG at that time. The efforts of HV to rewrite or reinterpret the events that occurred at that time lack support. KPG clearly linked the casinos in the two counties as a final effort to make the Cherokee County project viable. HV has failed to produce any evidence that KPG would not have proceeded in Cherokee County had it been approved in Sumner. In

sum, the court finds nothing to support HV's position concerning KPG's Southern Strategy. Therefore, the court finds that KPG did use good faith commercially reasonable efforts to obtain the final management contract for Cherokee County.

The court next turns to the issue of whether the final management contract was "reasonably acceptable" to KPG. Both parties have extensively argued this issue, but HV has spent most of its efforts in attempting to demonstrate that KPG is not entitled to summary judgment on it. KPG has argued that the final management contract was not reasonably acceptable to it because the development of a casino under the terms required by the KELA in Cherokee County was not economically viable in light of the competition from the Quapaw casino in Oklahoma. HV contends that KPG breached the sale contract by terminating it even though it had received a reasonably acceptable management contract and would have received, but for its termination, a final management contract. First, HV suggests that KPG received a reasonably acceptable management contract primarily because KPG negotiated a variety of issues and was granted accommodations on a number of points including being allowed to phase in the required $225 million in infrastructure over the term of the contract. Second, HV contends that KPG cannot rely on extraneous matters like "competition, economic conditions, projected returns, etc." to determine if the management contract was reasonably acceptable. HV contends that

KPG cannot do so because the term "management contract" is defined in the sale contract with the meaning set forth in the KELA. Thus, HV argues that KPG is limited to consideration of the "contractual terms which [the] [Kansas Gaming] Authority is capable of bestowing." Third, HV asserts that KPG cannot argue that the management contract was not reasonably acceptable because of the competitive impact of the Downstream Casino. HV suggests this condition cannot be implied because the parties did not bargain for that contingency. Fourth, HV contends that KPG cannot withdraw from the sale contract because withdrawal is only allowed under section 13.1 if KPG is not designated as the manager. Finally, HV argues, in the alternative, that if the court finds that the contract is ambiguous, then the parties' prior course of dealings show that KPG can only withdraw if (1) it cannot secure the necessary governmental agreements and approvals; or (2) legal obstacles preclude gaming on the property.

In Kansas, reasonable means "fair, proper, just, moderate, [and] suitable under the circumstances." Tonge v. Simmons, 27 Kan.App.2d 1048, 11 P.3d 77, 81 (2000) (quoting Black's Law Dictionary 1265 (6th ed. 1990)). The court agrees with HV that reasonable does not mean unlimited. Rather, what is reasonable will vary according to the circumstances. Thus, "reasonably acceptable" means that judgment should be exercised with regard to what is right and fair under the circumstances. See, e.g., Dunkin'

<u>Donuts Inc. v. Sharif, Inc.</u>, 177 Fed.Appx. 809, 814 (10th Cir. 2006)(franchisor did not breach franchise agreement by unreasonably withholding consent to franchisee's proposed transfer of its franchisee interest to another franchisee, where franchise agreement required that "transferee shall have a good credit rating and business qualifications reasonably acceptable to" franchisor, and other franchisee was in default under his own franchisee agreement for failure to report gross sales of one of his shops and to pay fees owed).

In considering the issue of whether KPG received a reasonably acceptable contract, the court shall examine the arguments made by HV. The court must initially note that HV has indeed been creative in its efforts. The court has carefully considered the sale contract and the accompanying Repurchase Agreement. The court believes that HV's arguments are an effort to rewrite the agreements made by the parties by ignoring certain provisions, including those in the Repurchase Agreement, and by relying on irrelevant parol evidence. Thus, for the following reasons, the court finds that HV's purported contract interpretation is inconsistent with the plain, unambiguous language of the sale contract and the Repurchase Agreement.

A careful review of the sale contract and the Repurchase Agreement reveals the problems with HV's arguments. Section 13.1 of the sale contract required KPG to use "good faith commercially

reasonable efforts" to obtain an acceptable management contract by, _inter alia_, (1) submitting "a complete and timely application," (2) providing additional information in support of its application, and (3) upon its "designation" as the Lottery Gaming Facility Manager, "diligently proceed[ing] to negotiate and execute" a management contract with the State. Section 13.1 further provides that if, "despite compliance with the covenants contained in this Section 13.1." KPG "is not designated the manager . . . and does not receive . . . <u>a fully executed, final, unappealed and unappealable [management contract] reasonably acceptable to [KPG]</u>, then KPG "shall have no further obligations" to HV, other than the obligations set forth in the Repurchase Agreement. The Repurchase Agreement confirmed KPG's right to "determine not to proceed with developing" the Cherokee County casino at any time "after [KPG] has applied for the necessary management contracts/agreement . . . [and] prior to being awarded a Lottery Gaming Facility Management Contract by the Kansas Gaming Authority." The sale contract defines the "Lottery Gaming Facility Management Contract Award Date" as the date when KPG "has obtained all final, unappealed and unappealable licensing under [KELA]." As noted previously, a management contract under the KELA does not become final and binding on the parties until after its approval by all three Kansas agencies: the Lottery Commission, the Review Board, and then the KRGC.

Thus, contrary to the arguments raised by HV, KPG was permitted under the sale contract and the Repurchase Agreement to engage in exploratory efforts under KELA to obtain an acceptable management contract, including negotiating and executing a non-binding management contract, while maintaining the right to reject any management agreement if it was not "reasonably acceptable to [it]," and then "withdraw from the Sale Contract without further liability" to HV at any time before the proposed management contract became final and binding. KPG had been preliminarily designated as a Lottery Gaming Facility Manager for the Southeast Kansas Gaming Zone. However, the management contract never became "final, unappealed and unappealable" as required by section 13.1. Section 13.1 clearly indicated that, after designation as the manager for the Southeast Kansas Zone, KPG was required to "negotiate and execute" a management contract before determining if it was acceptable. The reference in section 13.1 to Lottery Gaming Facility Management Contract was defined in the agreement and in KELA as the final unappealed and unappealable management contract. Thus, the preliminary agreement that KPG signed was not a "reasonably acceptable" management contract as suggested by HV. HV members understood that at the time. Their position now is untenable.

HV has also suggested that KPG could only terminate in accordance with the provisions of section 16.5 of the sale

contract.  The language, however, of that section, coupled with the language contained in section 13.1, fails to support that contention.  In section 16.5, the parties set forth the opportunity for KPG to terminate the contract only if KPG could not legally proceed with developing the casino.  This force majeure provision, however, is not a part of section 13.1.  HV appears to contend that the phrase "determine not to proceed" in section 13.1 means "legally could not proceed."  The plain language of section 13.1 suggests otherwise.  Moreover, section 13.1 is subject to the Repurchase Agreement while section 16.5 is not.

HV's contention that KPG was precluded by the sale contract from considering matters such as competition, economic conditions and projected returns in determining whether the management contract was reasonably acceptable to it lacks any support in the language of the documents.  Section 13.1 does not qualify the reasons why KPG may decide, in its discretion, whether the management contract is reasonably acceptable to it.  Moreover, the Repurchase Agreement allowed KPG to withdraw from developing the Cherokee County casino "if for any reason [it wants] to withdraw."  The plain language of the documents is simply at odds with the interpretation argued by HV.  Moreover, the provisions of the sale contract demonstrate that where the parties intended to exclude economic considerations from a provision, they expressly did so.  The sale contract includes a force majeure clause which identifies

certain events which would extend KPG's deadline to make a final contingent payment to HV because of delays in the construction of the casino. The parties expressly excluded from the definition of "force majeure event" any "monetary or financial event impacting [KPG], including unavailability of credit . . . or adverse financial market condition." Section 13.1, however, contains no such exclusion with respect to the meaning of "reasonably acceptable." The omission of such exception from section 13.1 demonstrates that the parties did not intend to exclude economic considerations from KPG's determination of whether the management contract was "reasonably acceptable to it." In sum, KPG had the right to reject any management contract for any reason provided that KPG's decision to do so was fair and right under the circumstances.

Having found that the sale contract and the Repurchase Agreement are unambiguous, the court cannot rely upon parol evidence to determine the intent of the parties as suggested by HV. In reaching this determination, the court notes that the sale contract and Repurchase Agreement contain broad integration clauses that preclude the consideration of parol evidence to interpret the meaning of those agreements. Thus, the court must determine the meaning of the contract from the contract itself.

The only issue left is whether the rejection of the management contract by KPG was reasonable as a matter of law. HV has argued

that KPG did receive a "reasonably acceptable" management contract and, therefore, was not authorized to reject it.

The facts are undisputed concerning the situation faced by KPG at the time that it decided whether the management contract was reasonably acceptable to it. KELA required KPG to invest $250 million in the Cherokee County casino and to pay 27 percent of its revenues to governmental entities. KELA further provided the manager of each casino with only a fifteen-year term on the management. KPG also faced the competition from the Quapaw casino, a casino that had opened earlier, involved a $300 million investment, and had significant tax advantages. KPG attempted to improve the viability of the Cherokee County casino by seeking to operate the casino in Sumner County, but that move was rejected by the State. Under these circumstances, KPG analyzed the economic situation and determined that the revenue projections for the Cherokee County casino, even with a phased investment, were inadequate. Steven Snyder, KPG's senior vice-president of corporate development, indicated in an affidavit that KPG's financial team analyzed and modeled the proposed Cherokee County casino in the following ways: "(a) using optimistic assumptions for gaming revenue projections and 'market penetration' rates; (b) including a 'terminal value' in its projections even though it was possible the proposed Cherokee County casino would have little or no value (at least as a casino) at the end of the 15 year term of

the Management Contract; and (c) assuming that [KPG] could secure an amendment to KELA lowering the minimum infrastructure investment in the Southeast Gaming Zone from $225 million to $125 million, also amend the Land Contract to reduce the total amount of the contingent payments from $37.5 million to $17.5 million." Snyder indicated that KPG concluded as follows: "Even under those aggressive and favorable assumptions and with a phased investment, [KPG] did not believe the Cherokee County casino would generate a sufficient return on investment to meet [KPG's] internal investment thresholds, and it certainly would not have met those thresholds under more realistic assumptions."

HV has failed to produce adequate evidence to counter KPG's determination that the development of the casino in Cherokee County was not economically viable. Moreover, KPG has offered expert testimony from Steve Wilson who concluded that KPG conducted its financial modeling in good faith, and that if the modeling was biased in any manner, it was biased in favor of the project rather than against it. Even without this evidence, the court is convinced that KPG acted properly in determining that the final management contract was not reasonably acceptable to it because HV has offered no evidence disputing that KPG reasonably believed that the casino was not viable.

In sum, the court finds that KPG is entitled to summary judgment on the issue of whether the management contract was

reasonably acceptable to it.  The court finds no evidence that KPG acted unreasonably in finding the management contract not reasonably acceptable.  Certainly, this decision is supported by the fact that no other gaming company has attempted to develop a casino in southeast Kansas.  In addition, the reasonableness of the decision is supported by the fact that HV did not seek to buy the land back.

In reaching the foregoing determinations, the court finds that KPG did not breach the sale contract.  KPG acted in accordance with the terms and conditions of the sale contract and the Repurchase Agreement.  HV has repeatedly suggested that this was a $40 million sale contract for the purchase of the real estate.  If that were the intent of the parties, the agreement could have been written in that fashion.  It was not, however.  The agreement provided that the title to the land passed to KPG upon the payment of $2.5 million.  The other payments were contingent upon the occurrence of certain events.  The sale contract required KPG to engage in certain activities prior to any decision to terminate, i.e., use good faith commercially reasonable efforts and determine whether the final management contract was reasonably acceptable.  KPG did so and then properly withdrew prior to receipt of a final management contract.  HV got exactly what it bargained for:  KPG's "good faith commercially reasonable efforts" and the option to repurchase the property upon KPG's withdrawal.

V.

In sum, the court finds that KPG is entitled to summary judgment here. The court finds that no genuine issues of material fact exist concerning whether KPG (1) used good faith commercially reasonable efforts to obtain a management contract, and (2) despite such efforts, did not obtain a reasonably acceptable final management contract. It is further undisputed that KPG provided HV with notice under the Repurchase Agreement, such that HV received the remedy for which it had bargained.

**MOTION TO STRIKE EXPERT TESTIMONY**

HV seeks to strike certain expert testimony from four individuals characterized as "gaming industry analysts" and Stephen Martino. HV contends that the court should strike this testimony and not consider it in resolving the cross-motions for summary judgment because (1) the testimony is outside the scope of the testimony that KPG designated in its interrogatory answers; (2) KPG failed to disclose Martino as a witness; and (3) the testimony of the analysts is not admissible because it lacks foundation and fails to satisfy the requirements under Fed.R.Evid. 702.

The court finds it unnecessary to consider this motion because the court, in deciding the motions for summary judgment, has not relied upon the testimony that HV seeks to have stricken. The court was able to grant summary judgment to KPG without consideration of any of this testimony. Accordingly, the court

shall deny this motion as moot.

      **IT IS THEREFORE ORDERED** that KPG's motion for summary judgment (Doc. # 109 in Case No. 08-4111) be hereby granted.

      **IT IS FURTHER ORDERED** that HV's motion for summary judgment (Doc. # 112 in Case No. 08-4111) be hereby denied.

      **IT IS FURTHER ORDERED** that judgment be entered for KPG and National Penn in Case Nos. 08-4111 and 08-4115 and against HV in those cases.

      **IT IS FURTHER ORDERED** that HV's motion to strike expert testimony (Doc. # 119 in Case No. 08-4111) be hereby denied as moot.

      **IT IS SO ORDERED.**

      Dated this 23rd day of July, 2010 at Topeka, Kansas.

                         s/Richard D. Rogers
                         United States District Judge